**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**


DANIEL LEWIS AND LINDA                         CIVIL ACTION NO.
NORWOOD LEWIS

VERSUS                                          17-1805-SDD-RLB

M7 PRODUCTIONS, LLC, JOHN P.
SHIREY, DAVID DUNGAN, HENRY
NOWACKI, MICHAEL HENDRICK,
KOW WING CHIN, AND LAURA
WALLGREN

<u>**RULING**</u>

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendants, M7 Productions, LLC, John P. Shirey, David Dungan, Henry Nowacki, Michael Hendrick, Kow Wing Chin, and Laura Wallgren ("collectively, Defendants"). Plaintiffs, Daniel Lewis ("Plaintiff")[2] and Linda Norwood Lewis ("Mrs. Lewis")(or collectively, "Plaintiffs"), filed an *Opposition*[3] to which Defendants filed a *Reply*.[4] For the following reasons, the Court finds that Defendants' motion for summary judgment should be granted in part and denied in part.

## I. FACTUAL BACKGROUND

On or about May 8, 2015, M7 Productions, LLC ("M7") began "principal photography" on the movie "The Magnificent Seven" in Baton Rouge, Louisiana.[5]

---

[1] Rec. Doc. No. 17.
[2] When the Court refers to Plaintiff in the singular, the Court is referring to Plaintiff Daniel Lewis.
[3] Rec. Doc. No. 23.
[4] Rec. Doc. No. 27.
[5] Rec. Doc. No. 1-2, ¶ 3.
58141

Plaintiff, who was otherwise known as "Papa D,"[6] was employed as a driver for M7,[7] and he provided transportation for the set decorating department of the production.[8] Defendants John "Phil" Shirey ("Phil" or "Shirey"),[9] David Dungan ("Dungan"), Henry Nowacki ("Nowacki"),[10] Michael "T-Bone"[11] Hendrick ("T-Bone" or "Hendrick"),[12] Kow Wing Chin ("Chin"), Roy Farthing ("Farthing"), and Laura Wallgren ("Wallgren")"[13] were employed by M7 in the set decorating department.[14] Plaintiff's job placed him in daily contact with the management personnel and the employees in the set decorating department.[15] Further, due to this day-to-day contact, Plaintiff claims it was well known on the set of "The Magnificent Seven" the he enjoyed talking to anyone about "how precious" his granddaughter is to him.[16]

Defendants present background information, supported by Plaintiff's deposition testimony, illustrating the strained relationship not only between Farthing and Plaintiff but also between Plaintiff and the other set dressers. While the details of these relationships as portrayed by Defendants is largely irrelevant to the motion before the Court, the Court acknowledges that Plaintiff and Farthing were irritated and annoyed with one another on

---

[6] "Papa D" was also on Plaintiff's identification badge. Plaintiff also alleges that the set decorating employees "knew" that his grand-daughter called him "Papa D." Rec. Doc. No. 1-2, ¶ 8. Plaintiff gained the additional nickname "Papa Lock" on September 1, 2015, when Plaintiff locked his keys in his truck. Rec. Doc. No. 1-2, ¶ 11.
[7] Rec. Doc. No. 17-3, p. 12.
[8] Rec. Doc. No. 1-2, ¶ 4.
[9] Phil had a management/supervisory position as a "leadman." Rec. Doc. No. 1-2, ¶ 6.
[10] Dungan and Nowacki were upholsterers/set dressers. Rec. Doc. No. 1-2, ¶ 7.
[11] Plaintiff avers that it was common for employees to go by nicknames. Rec. Doc. No. 1-2, ¶ 8.
[12] T-Bone had a management/supervisory position as the "gang boss" for the set dressers. Rec. Doc. No. 1-2, ¶ 6.
[13] Chin, Farthing, and Wallgren were set dressers. Rec. Doc. No. 1-2, ¶ 7.
[14] Rec. Doc. No. 1-2, ¶ 5.
[15] Rec. Doc. No. 1-2, ¶ 4.
[16] Rec. Doc. No. 1-2, ¶ 9.
58141

a consistent basis.[17]

The facts giving rise to this lawsuit involved a display of mannequins by members of the set department.[18] Sometime in late August of 2015, Farthing allegedly dressed up a male mannequin and a female child mannequin and placed the name "Roy" on the adult male mannequin. The male mannequin was positioned to be holding hands with a "female child mannequin."[19] Defendants do not dispute these facts but argue that Plaintiff believed the mannequin depicted Farthing, so Plaintiff initially had "no problem" with the mannequins.[20]

Farthing allegedly commented that he needed to dye the female child mannequin's hair red, presumably in reference to Plaintiff's granddaughter who has red hair.[21] Defendants claim that Plaintiff spoke to Dungan about a woman with red hair whom he met on another set. Because Dungan presumed Plaintiff was attracted to this woman, Defendants contend Dungan's testimony suggests that the child mannequin could have represented this other woman.[22] Defendants maintain that, at this time, Plaintiff had no problem with the display.[23]

Around September 2, 2015, Plaintiff contends Defendants changed the positions of the mannequin to reflect that the "adult male mannequin" was sitting on a table with his

---

[17] Rec. Doc. No. 17-1, pp. 2-5.
[18] The allegations in this matter involve a visual display that was constructed on the set of the movie "The Magnificent Seven." Both Plaintiffs and Defendants interchangeably refer to the "mannequins," "a mannequin and a doll," or "a set dummy and a doll" in reference to the two mannequins or dolls used in the display. The Court will refer to the "mannequins" as this is the most common reference by the Parties, and it is undisputed that one mannequin is an adult male and the other is a female child.
[19] Rec. Doc. No. 1-2, ¶ 10.
[20] Rec. Doc. No. 17-1, p. 7, citing Rec. Doc. No. 17-4, pp. 46-47.
[21] *Id.*
[22] Rec. Doc. No. 17-1, p. 7, citing Rec. Doc. No. 17-12, ¶ 6.
[23] Rec. Doc. No. 17-1, p. 7, citing Rec. Doc. No. 17-4, pp. 152-53, 158.

58141

legs spread, and the "child mannequin" was placed with her head between the legs, apparently "performing fellatio on him."[24]  The name "Papa Lock" was placed on the "adult male mannequin"[25] along with "Gambit," both nicknames allegedly referring to a subject frequently discussed by Plaintiff ostensibly identifying Plaintiff as the adult male mannequin.

Defendants claim that a sticker saying "Atlanta" was added to the mannequin's hat representing where Farthing talked about heading after leaving M7.[26]  Plaintiff argues that "Atlanta" and "Gambit" are references to a different movie production about which Plaintiff frequently commented, "[i]f I ever hear Atlanta or Gambit again, I will throw up."[27]  Plaintiff also argues that he talked about how he gambles at the casinos as a hobby, and the adult mannequin had an ace of spades in his hand.  Further, the hat on the adult mannequin was replaced at some point with one that Plaintiff wore every day.[28]

Plaintiff maintains the adult male mannequin was intended to represent him, and the other mannequin was intended to represent his granddaughter.[29]  Plaintiff complained at work that the mannequin display was upsetting and "not right," but he does not recall to whom he initially reported his complaint.[30]

The record reflects that this mannequins display remained on display for between two and three weeks.  During this time, the mannequins were moved into various different positions, and Plaintiff claims he continued to complain.  On September 17, 2015, Plaintiff

---

[24] Rec. Doc. No. 1-2, ¶ 12.
[25] Plaintiff argues that he locked his keys in his truck and gained the nickname Papa Lock on the same day that the name tag "Papa Lock" was placed on the mannequin.  Rec. Doc. No. 23, p. 2.
[26] Rec. Doc. No. 17-1, p. 7, n. 11, citing Rec. Doc. No. 17-5, p. 3.
[27] Rec. Doc. No. 23, p. 2, citing Rec. Doc. No. 17-5, p. 3.
[28] Rec. Doc. No. 23, p. 3, citing Rec. Doc. No. 17-5, pp. 3-5.
[29] *Id.*
[30] Rec. Doc. No. 17-6, pp. 16-17.
58141

contends that the "set dressers" added a "speech balloon" above the "male mannequin's" head that stated, "[t]ake this with a grain of salt." Plaintiff alleges this speech balloon was directed at him due to his complaints.[31] On September 18, 2015, Plaintiff claims the "set dressers" modified the display and removed the "child mannequin's" head from the lap of the other mannequin. The "set dressers" then allegedly placed the "adult mannequin's" hand in the "crotch area" of his lap with the "child mannequin" located next to him and allegedly "looking down" at the "adult mannequin."[32]

Defendants challenge Plaintiff's timing of these events. Defendants contend Plaintiff initially took a picture of the display and showed it to his union captain, prompting the "doll" to be moved to a standing position "the next day."[33] Defendants cite Plaintiff's testimony, arguing that the mannequins remained in the initial posture, in the lap, for approximately one week.[34] However, the transcript of the testimony cited by Defendants actually states "for at least a week plus," indicating Plaintiff's belief that the display was up for longer than one week.[35]

During the time of these mannequin displays, Plaintiff's supervisor and "leadman" Shirey was out of state, and T-Bone, the "gang boss," was left in charge of the set dressing department on "The Magnificent Seven" set. Plaintiff claims he asked T-Bone to "stop the harassment" because it was "driving [him] crazy."[36] Plaintiff further claims that T-Bone not only failed to take action in response to his request, but instead, he

---

[31] Rec. Doc. No. 1-2, ¶ 16.
[32] *Id.* at ¶ 17.
[33] Rec. Doc. No. 17-1, p. 8, citing Rec. Doc. No. 17-6, p. 13.
[34] Rec. Doc. No. 17-1, p. 8, citing Rec. Doc. No. 17-6, p. 7.
[35] Rec. Doc. No. 17-6, p. 7, ll. 16-17.
[36] Rec. Doc. No. 1-2, ¶ 13.
58141

"escalated the harassment" by conducting daily meetings in front of the mannequins. The display was placed where the set department had daily meetings, and when T-Bone conducted the meetings, he did it standing "right in front of the doll," which caused Plaintiff to stop going to the daily meetings.[37] Plaintiff also testified that the display was placed so that he had to pass it to go to the bathroom.[38] Thus, to simply gain access to the water, Powerade, snacks, and drinks that were provided on the job, Plaintiff would have to see the display.[39] Further, Plaintiff testified that T-Bone's own declarations acknowledge that he was the "Gang Boss."[40] T-Bone states in his declaration that he established the list entitled "Driver Rules" that was implemented against Plaintiff, and he also admits in his declaration that he had Plaintiff was ultimately removed from the set department.[41]

While Defendants argue that, upon Shirey's return, he directed that the "doll" and mannequin be removed altogether,[42] Plaintiff maintains the damage had been done. Further, Plaintiff objected to his transfer because he felt that M7 was "taking action" against him, rather than on his co-employees, in "retaliation" for Plaintiff's complaints. Also, the position to which he was transferred "ended sooner" that the position from which he was transferred. Plaintiff claims that the "retaliation culminated" on October 9, 2015, when he was released from employment while his former position continued to be employed.[43]

---

[37] Rec. Doc. No. 17-4, p. 10; Rec. Doc. No. 17-6, p. 6.
[38] Rec. Doc. No. 17-4, pp. 40-43.
[39] Rec. Doc. No. 17-6, p. 16.
[40] Rec. Doc. No. 17-14.
[41] *Id.*
[42] Rec. Doc. No. 17-1, p. 8, citing Rec. Doc. No. 17-6, p. 15.
[43] Rec. Doc. No. 1-2, ¶ 23.

58141

Defendants contend that Plaintiff's transfer to the construction department was due to a wholly different incident.[44] Defendants argue that Plaintiff was transferred because he refused to complete certain tasks required by his driver position, such as pushing the button to lift and lower the lift gate. Defendants contend Plaintiff specifically refused to operate the lift gate for Nowacki or Dungan because they "didn't know how to act right."[45] T-Bone allegedly reported Plaintiff's behavior to Plaintiff's union captain and asked the union to replace Plaintiff.[46] Defendants also challenge Plaintiff's assertion that, had he stayed with the set dressing department, his job would have lasted longer, arguing that Plaintiff has no way of knowing on what date his employment would have ended had he remained in the set dressing department.[47]

Plaintiffs initially filed suit on September 15, 2016, in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, alleging three claims against the Defendants: intentional infliction of emotional distress, defamation, and loss of consortium.[48] Plaintiffs amended their petition[49] on December 7, 2017, adding an additional claim of sexual harassment pursuant to Title VII of the Civil Rights Act of 1964.[50] Subsequently, this matter was removed to the United States District Court for the Middle District of Louisiana on December 28, 2017.[51] Defendants now move for summary judgment on all Plaintiffs' claims.[52]

---

[44] Rec. Doc. No. 17-1, pp. 6-7.
[45] Rec. Doc. No. 17-1, p. 6, citing Rec. Doc. No. 17-4, pp. 29-30.
[46] Rec. Doc. No. 17-1, p. 6, citing Rec. Doc. No. 17-4, p. 32; No. 17-6, p. 29; No. 17-14, ¶ 5.
[47] Rec. Doc. No. 17-1, p. 7, citing Rec. Doc. No. 17-3, pp. 25-26; No. 17-6, pp. 38-40.
[48] Rec. Doc. No. 1-3.
[49] Rec. Doc. No. 1-2.
[50] 42 U.S.C. § 2000e *et seq.*
[51] Rec. Doc. No. 1.
[52] Rec. Doc. No. 17.
58141

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[53]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[54]   The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[55]   A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[56]   If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[57]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there

---

[53] Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir. 1996).
[54] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).
[55] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  *See also Gunaca v. Texas,* 65 F.3d 467, 469 (5th Cir. 1995).
[56] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*)(quoting *Celotex,* 477 U.S. at 323-25, 106 S.Ct. at 2552).
[57] *Id.* at 1075.
58141

is a genuine issue for trial.[58]  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[59]  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[60]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[61]  Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[62]

The Court "has no duty to search the record for material fact issues.  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[63]  "Conclusory allegations unsupported by specific facts, however, will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any significant probative evidence tending to support the complaint.'"[64]

### B.    Plaintiff's Failure to Submit Opposing Statement of Material Facts

As Defendants note, Plaintiffs' statement of undisputed facts[65] appears blank and does not contain any disputed facts or citations to the record.  In opposing a motion for

---

[58] *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

[59] *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047.

[60] *Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[61] *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[62] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[63] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)(citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

[64] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. 249)(citation omitted)).

[65] Rec. Doc. No. 24-3.

58141

summary judgment, a party is required under local Rule 56(b) to:

> submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule.

As Plaintiffs failed to comply with this rule, Defendants are correct that the Court must deem admitted their record-supported statements of undisputed fact. Rule 56(f) provides:

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

However, according to Fifth Circuit jurisprudence, in such instances the Court can still consider record evidence to determine if there is a factual dispute.[66] Because Plaintiff has submitted evidence with his *Opposition* to contradict some of Defendants' statements, the Court will consider those statements opposed. The Court now turns to the substantive claims raised by Plaintiffs.

---

[66] *See Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998) (holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment." (citation omitted)).
58141

### C.    Title VII Claim

#### 1.    Individual Defendants

Although the individual defendants have not raised this issue, the law is clear that only employers, not individuals who do not meet the definition of "employers," can be liable under Title VII.[67]   Supervisory personnel and other agents of the employer are not considered employers for purposes of liability.[68]   "[T]here is no individual liability for employees under Title VII."[69]   Accordingly, summary judgment is granted in favor of Shirey, Dungan, Nowacki, Hendrick, Chin, and Wallgren on Plaintiff's Title VII claim as they are not subject to Title VII liability as a matter of law.   M7 is the only proper defendant subject to Plaintiff's Title VII claim.

#### 2.    Timeliness

M7 contends Plaintiff's Title VII claim is untimely.   M7 notes that Plaintiff alleged in his *Complaint* that the only sexual act was the positioning of the mannequin and doll, which ended as of September 18, 2015.[70]   M7 is correct that an EEOC charge must be brought within 300 days of the discriminatory conduct;[71] thus, it maintains that Plaintiff was required to file an EEOC charge for the allegedly discriminatory conduct on or before July 14, 2016.   M7 claims Plaintiff did not file his EEOC charge until September 16, 2016, nor did he make a timely initial inquiry with the EEOC.   In support of this argument, M7

---

[67] *See Grant v. Lone Star Co.*, 21 F.3d 649, 651-52 (5th Cir. 1994)(citing Clanton v. Orleans Parish Sch. Bd., 649 F.2d 1084, 1099 (5th Cir. 1981) and *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993), *cert. denied*, 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994)).
[68] *Id.*
[69] *Muthukumar v. Kiel*, 478 Fed.Appx. 156, 158 (5th Cir. 2012)(citing *Smith v. Amedisys Inc.*, 298 F.3d 434, 448 (5th Cir. 2002); *see also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 381, n. 1 (5th Cir. 2003)).
[70] Rec. Doc. No. 1-2, p. ¶ 17.
[71] *See Johnson v. Fluor Corp.,* 181 F.Supp.3d 325 (M.D. La. 2016).
58141

submits a vague Freedom of Information Act ("FOIA") request from the EEOC.[72]  M7 also claims Plaintiff's EEOC charge checked only the box for retaliation, a claim not asserted, and not sex.  Thus, argues M7, Plaintiff has failed to exhaust his administrative remedies on his Title VII claim, and this claim should be dismissed.

The Court disagrees.  First, Plaintiff submits a stamped receipt and letter, both dated July 12, 2016, filed with the EEOC detailing the investigation request into the incident at issue herein.[73]  Plaintiff also submits an acknowledgment letter from the EEOC, dated July 21, 2016, wherein the EEOC acknowledges receipt of Plaintiff's filed charge.[74]  Thus, M7's claim that Plaintiff did not file an EEOC charge until September of 2016 is contradicted by the EEOC's acknowledgement letter.

Further, while Plaintiff may not have checked the "sex" box on the EEOC form, the nature of Plaintiff's narrative makes clear the conduct of which he complains. The Fifth Circuit has found that a plaintiff's failure to check a box on an EEOC Charge is not always fatal error.  For instance, in *Sanchez v. Standard Brands, Inc.*, the Fifth Circuit concluded that a plaintiff's failure to check the "national origin" box on her EEOC Charge was "a mere 'technical defect or omission'"[75] and "decline[d] to hold that the failure to place a check mark in the correct box [was] a fatal error."[76]  Ultimately, because the plaintiff had alleged sufficient facts to give rise to a national origin discrimination claim, the *Sanchez* court found that plaintiff's failure to mark the appropriate box did not bar her from including

---

[72] Rec. Doc. No. 17-17.
[73] Rec. Doc. No. 23-1.
[74] *Id.* at p. 7.
[75] 431 F.2d 455, 462 (5th Cir. 1970).
[76] *Id.* at 463.
58141

her national origin discrimination claim in her complaint.[77]  Accordingly, M7's timeliness argument is without merit and contradicted by record evidence.

### 3.    Title VII Sexual Harassment/Hostile Work Environment Elements

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[78]  Sexual harassment is a form of sex discrimination. The Supreme Court has recognized two types of sexual harassment claims: those based on requests for sexual favors that result in adverse employment actions (a *quid pro quo* claim) and those where bothersome attentions or sexual remarks create a hostile work environment.[79]  It is undisputed that this matter involves an alleged hostile work environment.

To establish a Title VII sexual harassment claim based on hostile work environment, the plaintiff-employee must show: (1) that he belongs to a protected class; (2) that he was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action."[80]  To affect a term, condition, or privilege of employment, the harassment must be "sufficiently severe or pervasive so as to alter the

---

[77] *Id.* at 463-64.

[78] 42 U.S.C. § 2000e–2(a)(1).

[79] *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998); *Burlington Industries, Inc. v. Ellerth,* 118 S.Ct. 2257 (1998); *Oncale v. Sundowner Offshore Servs., Inc.,* 114 S.Ct. 3678 (1998).

[80] *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 298 (5th Cir. 2001)(citing *Shepherd v. Comptroller of Public Accounts of the State of Tex.,* 168 F.3d 871, 873 (5th Cir. 1999)).

58141

conditions of the [plaintiff's] employment and create an abusive working environment."[81] The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[82]

M7 challenges only two of the above listed *prima facie* elements of Plaintiff's sexual harassment hostile work environment claim: M7 contends Plaintiff cannot show that the harassment affected a term, condition, or privilege of employment or that M7 knew or should have known of the harassment and failed to take prompt remedial action.[83] As M7 concedes the other elements by failing to argue them, the Court limits its analysis to the two challenged elements.

### a. Affect Term, Condition, or Privilege of Employment

The Court must determine whether the alleged facts, viewed in the light most favorable to Plaintiff, constitute severe or pervasive sexual harassment sufficient to create a hostile work environment. Determining whether a hostile work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance.[84] Not all harassment will affect the terms, conditions, or privileges of employment. "The mere utterance of an offensive comment or remark which hurts an employee's feelings is not sufficient to affect the

---

[81] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).
[82] *Aryain v. Wal–Mart Stores of Tex., LP,* 534 F.3d 473, 479 (5th Cir.2008) (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275).
[83] Rec. Doc. No. 17-1, p. 14.
[84] *Septimus v. Univ. of Houston,* 399 F.3d 601, 611 (5th Cir.2005).
58141

conditions of employment."[85]  Likewise, "[s]imple teasing, offhand comments, and isolated incidents, unless extremely serious, are not sufficient to affect the terms, conditions or privileges of employment."[86] "While what makes up an actionable claim for a hostile work environment is a fact-sensitive determination, the Supreme Court's decisions strongly suggest that such allegations are not to be exclusively resolved by the jury."[87] Furthermore, courts have set a high standard for what constitutes severe and pervasive harassment for purposes of a hostile work environment claim: "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace."[88]

M7 contends Plaintiff cannot show that the mere existence of the doll's face down in the mannequin's lap for "possibly one week" was sufficiently severe or pervasive to alter a term or condition of his employment.[89]  First, the Court notes that it has not been established by record evidence that the mannequins' initial posture (the fellatio posture) was in place for "possibly one week."  Plaintiff testified that it was in place "one week plus," and has presented evidence of a timeline that supports that the display was up for at least two weeks.  For example, it is undisputed that the initial posture was erected on September 2, 2015.  It is also undisputed that the mannequins were altered with additional identifying markers and speech bubbles on September 17, 2015, which is 15 days or over

---

[85] *Alleman v. Louisiana Dept. of Economic Development,* 698 F.Supp.2d 644, 658 (M.D.La.2010).

[86] *Id.,* citing *Lauderdale,* 512 F.3d at 163; *Merit or Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

[87] *Hartfield v. Pizza Inn, Inc.,* No. 02–0097, 2002 WL 31056595, *3 (E.D.La. Sept. 13, 2002)(citing *Indest v. Freeman Decorating Inc.,* 164 F.3d 258, 264 (5th Cir.1999)).

[88] *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed .2d 607 (1997).

[89] Rec. Doc. No. 17-1, p. 14.

58141

two weeks later, and the posture was altered again on September 18, 2015, to reflect another sexual situation involving a male adult and a female child, which is 16 days after the initial posture.

Second, the jurisprudence upon which M7 relies by analogy is unavailing. M7 highlights that, in *Wilkinson v. Potter*,[90] the plaintiff alleged daily staring, unnecessary appearances in her work area, following her, obstructing her path, touching on the arm, and shaking a rod in plaintiff's direction, which was not found to be severe or pervasive. Similarly, M7 relies on *Paul v. Northrop Grumman Ship Sys.*,[91] wherein the harasser touched his chest to plaintiff's breasts, stared at her, followed her, obstructed her path, and touched her stomach and waist, and this conduct was not found to be a hostile working environment. M7 contends that, based on these "analogous" cases, as well as the applicable legal standards, the conduct alleged by Plaintiff "falls far below the severe or pervasive standard."[92]

Plaintiff argues the Court should not rely on M7's "whitewashed description" of the visual display and instead observe the photographs of the display that he took and submitted in determining the severity of the harassment alleged.[93] Plaintiff further maintains that the severity of the display certainly affected the conditions of his employment. The display was placed where daily meetings were conducted, wherein

---

[90] 442 F.Supp.2d 304, 310 (M.D. La. 2006), *aff'd*, 236 F.App'x 892 (5th Cir. 2007).
[91] 309 F.App'x 825, 826 (5th Cir. 2009).
[92] Rec. Doc. No. 17-1, p. 15.
[93] Rec. Doc. No. 23, p. 7, citing Rec. Doc. No. 24-2. M7 objects to Plaintiff's photographs, without citation to evidentiary rules or jurisprudence, arguing the photographs lack foundation and are not authenticated. These photographs were, however, used at Plaintiff's deposition and contain metadata demonstrating that the photographs were taken during the time period of September 2-18, 2015. Reserving to M7 all trial objections, the Court finds no reason to strike the photographs and will consider them for purposes of summary judgment.
58141

information relevant to Plaintiff's job duties was discussed, and T-Bone actually conducted the meetings standing in front of the display, causing Plaintiff to stop attending the meetings.[94]  Further,  Plaintiff was forced to pass the display to simply go to the restroom or to get water or other snacks.[95]  Plaintiff contends that, "at the very least," genuine issues of material fact exist regarding whether there was a severe and pervasive hostile working environment that affected the terms and conditions of Plaintiff's employment.

The Court finds that Plaintiff has presented sufficient evidence that the conduct at issue affected a term, condition, or privilege of his employment based on the severity of the display.  The cases upon which M7 relies are not factually similar and provide no support for M7's position.  Notably, none of these cases involved a display suggesting that the alleged victim was committing a criminal sexual act upon a child.[96]  Further, although this case involves a unique factual scenario, the Court finds that the following cases are more analogous than those cited by M7.  In *Waltman v. International Paper Company*,[97] the Fifth Circuit reversed summary judgment granted in favor of the employer where the plaintiff received over thirty pornographic notes in her locker and sexually explicit pictures and graffiti were drawn on the walls of the worksite, although only some of the drawings were directed at the plaintiff.  While the list of acts of harassment in *Waltman* was lengthy, explicit, and occurred over a long period of time, this case is one

---

[94] Rec. Doc. No. 23, p. 7.
[95] Rec. Doc. No. 23, pp. 7-8.
[96] The Court finds it curious that Defendants fail to address that the display involved a minor engaged in sexual acts with an adult male and the implications that combination would suggest.
[97] 875 F.2d 468 (5th Cir. 1989).
58141

of severity more so than pervasiveness, and the Court finds that the visual display involved in *Waltman* is somewhat similar to the present case.

Also, in *Mota v. University of Texas Houston Health Science Center*,[98] the Fifth Circuit considered a "same sex" harassment case where a male professor/employee claimed that his male supervisor created a hostile work environment at the university where they were both employed. The Fifth Circuit noted that much of the conduct of which the plaintiff complained consisted of verbal threats to the plaintiff's employment if the plaintiff spoke of the sexual advances, and there was also evidence of unwanted physical contact of a sexual nature. Notable for this case is that the Fifth Circuit found that the alleged sexually harassing conduct caused such emotional distress and psychological problems that the professor/employee began to avoid engagements and conferences at which the supervisor was also present. Similarly, in the present case, the conduct caused Plaintiff to avoid and/or fail to attend mandatory meetings because they were conducted in front of the mannequin display. There is further evidence that T-Bone, as the acting supervisor in Shirey's absence, used these meetings to modify work rules that would cause any employee – like Plaintiff – to fail if he was unaware of the changes.

In the present matter, it is undisputed that the mannequin display involved a sexual act involving an adult and a child, which depicts a criminal and grossly offensive act.[99] Plaintiff has presented summary judgment evidence that demonstrates a genuinely disputed material fact regarding the intention that he was the suggested adult represented in the display and that his granddaughter was the suggested child. The Court finds the

---

[98] 261 F.3d 512, 524 (5th Cir. 2001).
[99] *See U.S. v. Williams*, 592 F.3d 511 (4th Cir. 2010)(addressing the egregious and criminal nature of pedophilia and circulating pornographic images involving children).
58141

display sufficiently severe in that it represents a child, and even more so if it represents Plaintiff's granddaughter. M7 fails to carry its burden on this element.

### b. The employer knew or should have known of the harassment and failed to take prompt remedial action[100]

As set forth above, the fifth element of a *prima facie* case of hostile work environment that a plaintiff must establish is that the employer knew or should have known of the harassment and failed to take prompt remedial action.[101] However, in cases where the alleged harasser is a supervisor with immediate or higher authority over the harassed employee, the employee need only satisfy the first four elements of the foregoing test.[102] Once the plaintiff employee makes this showing, an "employer is subject to vicarious liability to a victimized employee."[103] The Parties appear to dispute whether element five is applicable in this matter as they disagree on whether a supervisor participated in the alleged harassment of Plaintiff.

M7 bases its argument on the fact that Shirey was Plaintiff's immediate supervisor and is not alleged to have participated in the sexual harassment; thus, element five applies in this case. Plaintiff maintains that T-Bone was the "gang boss" with supervisory authority over the entire department in Shirey's absence; thus, because T-Bone participated in the alleged harassment, Plaintiff does not have the burden to establish element five.

---

[100] The Court notes that M7 failed to assert or argue the *Faragher/Ellerth* affirmative defense; therefore, the Court did not analyze or consider its applicability herein.

[101] *See* note 75, *supra*.

[102] *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). This is based on the decisions of *Burlington Ind. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

[103] *Faragher,* 524 U.S. 775, 118 S.Ct. at 2292–93.

58141

The Court finds that Plaintiff has produced sufficient summary judgment evidence, discussed at length above, regarding T-Bone's authority to change rules and set Plaintiff's driving schedule, to show that T-Bone had supervisory authority over Plaintiff. The Court finds that there is, at least, an issue of fact regarding whether element five is applicable here. There is evidence in the record that T-Bone refused to take down the display, conducted meetings in front of the display, and enacted "rules" designed to punish Plaintiff for failing to attend the meetings. Accordingly, M7 is not entitled to summary judgment on Plaintiff's Title VII hostile work environment claim.

### D. State Law Claims[104]

#### 1. Defamation

A federal court sitting in diversity applies the substantive law of the forum state.[105] The Louisiana Supreme Court has held that defamation is a tort involving "the invasion of a person's interest in his [or her] reputation and good name."[106] Defendants move for summary judgment on Plaintiff's defamation claim, arguing it is untimely, and Plaintiff is unable to prove the elements of his defamation claim. The Court discusses each of these issues in turn.

##### a. *Timeliness*

Claims for defamation are delictual in nature and are subject to the one-year prescriptive period set forth in Louisiana Civil Code Article 3492, which commences to

---

[104] The Court exercises supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

[105] *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

[106] *Sassone v. Elder*, 626 So.2d 345, 350 (La. 1993).

58141

run from the day injury or damage is sustained.[107] For prescription purposes, damages are sustained from the date the injury is inflicted, if immediately apparent to the victim, even though the extent of the damages may not yet be known.[108] In *Wiggins v. Creary,*[109] and *Rice v. Felterman,*[110] the court found that knowledge of the damage-causing publication by the plaintiff is required for the commencement of the one-year prescriptive period.[111]

Plaintiffs allege in their operative complaint that the position of the mannequins was changed on or about September 2, 2015, to demonstrate that the child mannequin was performing fellatio on the adult male mannequin, who Plaintiff believes to be and alleges represents him. Plaintiff testified these mannequins remained in this position for approximately one to three weeks, when they re-positioned again on September 17, 2015, with further identifying markers added to the male adult mannequin, and altered again on September 18, 2015. The new position of the display on September 18, 2015, also depicted a different sexual act between the adult and child mannequins.

Without citation to any record evidence, Defendants argue Plaintiff's defamation claim has prescribed because suit was filed on September 21, 2016, more than one year after September 18, 2015.[112] However, the *Notice of Removal* filed by Defendants in this matter acknowledges in Paragraph 1 that, "[o]n or about September 15, 2016, plaintiffs

---

[107] *See Wiggins v. Creary,* 475 So.2d 780, 781 (La.App. 1st Cir. 02/26/85), *writ denied,* 478 So.2d 910 (La.1985).
[108] *Wiggins,* 475 So.2d at 781.
[109] 475 So.2d at 781.
[110] 2000–2525 (La.App. 1st Cir.3/28/02), 814 So.2d 696, 699.
[111] *See Clark v. Wilcox,* 2004–2254 (La.App. 1st Cir.12/22/05), 928 So.2d 104, 112–113, *writ denied,* 2006–0185 (La.6/2/06), 929 So.2d 1252.
[112] Rec. Doc. No. 17-1, p. 10.
58141

filed a petition that is now pending" in state court.[113]  Indeed, Plaintiffs submit the "filed

stamped" first page of the petition and the receipt for filing fees attached as Exhibit 1 to

Plaintiffs' *Opposition*.[114]  Defendants' prescription claim is frivolous, at best, and their

motion for summary judgment on the ground that Plaintiffs' defamation claim is prescribed

is DENIED.

### b. Defamation Claim Elements

Both federal and state courts in Louisiana have held that, "[t]o maintain a

defamation action under Louisiana law, a plaintiff must prove the following elements: '(1)

a false and defamatory statement concerning another; (2) an unprivileged publication to

a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting

injury.'"[115]  **If any single element of the tort is lacking, the cause of action fails**.[116]  As

such, summary judgment is appropriate if the plaintiff is unable to establish that there is

a genuine issue of material fact regarding any one of these elements.[117]

### i.   False or Defamatory Statement

The threshold issue in a defamation action is whether the words complained of are

defamatory.[118] Defamatory words are divided into two categories: those words that are

susceptible of being defamatory in meaning and those that are defamatory *per se*.[119]

"Words which expressly or implicitly accuse another of criminal conduct, or which by their

---

[113] Rec. Doc. No. 1, p. 2.
[114] Rec. Doc. No. 23-1.
[115] *Schmidt v. Cal-Dive International, Inc.*, 240 F.Supp.3d 532, 542 (W.D. La. 2017)(quoting *Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 674 (La. 2006); *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 181 (5th Cir. 2009)).
[116] *Id.* at 542 (citing *Costello v. Hardy*, 864 So.2d at 139)(emphasis added).
[117] *See Daigle v. Computrac*, 835 F.Supp. 903, 906 (E.D.La.1993).
[118] *Costello*, 864 So.2d at 141.
[119] *Kennedy v. Sheriff of East Baton Rouge,* 2005–1418 (La.7/10/06), 935 So.2d 669, 674–75.
58141

very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory *per se.*"[120]  Statements susceptible to a defamatory meaning are "words that tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person or otherwise expose a person to contempt and ridicule," and convey an element of personal disgrace, dishonesty or disrepute.[121] Whether a particular statement "is *objectively* capable of having a defamatory meaning is a legal issue to be decided by the court, considering the statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener."[122]

Here, the purported defamatory statement was not one of words but the offensive mannequin display that represented sexual acts between an adult male and a minor child. While Defendants argue Plaintiff cannot establish a "false or defamatory statement," Defendants' argument is not based on the grounds that the "statement" was a visual display, as opposed to written or spoken words.[123]  Thus, the Court will assume *arguendo* that the mannequins display constitutes a "statement."  Further, although the Parties dispute whether Plaintiff can establish that the display was specifically about him, the Court finds this irrelevant since Plaintiff is unable to establish the required element of publication.

---

[120] *Id.* at 675.
[121] *Costello*, 864 So.2d at 141.
[122] *Bell v. Rogers*, 698 So.2d 749, 754 (La.Ct.App. 2nd Cir. 08/20/97)(quoting *Kosmitis v. Bailey*, 685 So.2d 1177, 1180 (La.Ct.App. 2nd Cir. 12/20/96)).
[123] Rec. Doc. No. 17-1, pp. 10-11.
58141

## ii. Publication

Plaintiff must show that the defamatory statement was published to a third party other than the plaintiff.[124] Defendants argue the purported "publication" only involves the "doll and mannequin, not Plaintiff."[125] Defendants maintain that it matters not that others may have believe one of the mannequins was Plaintiff because "no one published such information."[126] Defendants further argue that it was Plaintiff who told "numerous people" that the mannequin depicted him, and no one communicated this idea to Plaintiff, "with the exception of Dungan."[127]

In opposition, Plaintiff argues that Defendants' requires a credibility determination of the various witness statements and testimony which is not proper at the summary judgment stage.[128] Further, Plaintiff claims that the fact that the display existed, which is undisputed, establishes publication "for purposes of defamation law in Louisiana," because the employees "all saw it."[129]

"Publication is a necessary element of defamation in Louisiana."[130] In this case, the Court finds that Plaintiff has failed to submit any summary judgment evidence of publication of the alleged defamatory statement to anyone outside of the movie production set, specifically, the set dresser department. The record evidence demonstrates that a visual display and accompanying verbal commentary, as crude and offensive as it may have been, were exchanged amongst co-workers in the set dresser

---

[124] *Hoffman v. Bailey*, 257 F.Supp.3d 801, 821 (E.D. La. June 20, 2017).
[125] Rec. Doc. No. 17-1, p. 11.
[126] *Id.*
[127] *Id.*
[128] Rec. Doc. No. 23, p. 3.
[129] *Id.*, citing *Simons v. Lewis*, 51 La. Ann. 327, 330, 25 So. 406, 407 (1898); *Trimble v. Moore*, 2 La. 577, 579 (1831).
[130] *Johnson v. Delchamps, Inc.*, 715 F.Supp. 1345, 1346 (M.D. La. June 26, 1989).
58141

department. There is no record evidence of publication outside the M7 set employees. Statements between co-workers made within the course and scope of their employment do not constitute publications for the purpose of defamation.[131] Because Plaintiff has failed to establish a genuine issue of material fact as to the publication of the alleged defamatory statement to a third party, Plaintiff's defamation fails as a matter of law.[132] Therefore, the Court grants Defendants' motion for summary judgment on Plaintiff's defamation claim.

### 2. Intentional Infliction of Emotional Distress ("IIED")

To maintain an action for IIED in Louisiana, Plaintiff must establish that (1) Defendants' conduct was extreme and outrageous; (2) Plaintiff suffered severe emotional distress; and (3) Defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.[133] The conduct complained of must be so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community.[134] Liability arises only where the mental suffering or anguish is extreme, and the distress suffered must be such that no reasonable person could be expected to endure it.[135]

---

[131] *Cangelosi v. Schwegmann Bros. Giant Super Mkts.,* 390 So.2d 196 (La.1980); *Commercial Union Ins. Co. v. Melikyan,* 424 So.2d 1114 (La.App. 1st Cir.1982). *See also, Johnson*, 715 F.Supp. at 1346; *Mitchell v. Tracer Const. Co.,* 256 F.Supp.2d 520, 526 (M.D. La. Apr. 16, 2003); and *Ioppolo v. Rumana*, 2012 WL 4960385 (M.D. La. Oct. 16, 2012).

[132] *See Doucet v. City of Bunkie,* 2006 WL 3256496 (W.D.La. Nov. 9, 2006) (granting summary judgment on "defamation *per se* claim" where the plaintiff "failed to come forward with any specific facts which establish a genuine issue for trial, with respect to her defamation claim").

[133] *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).

[134] *Id.*

[135] *White*, 585 So.2d at 1210.

58141

Defendants first argue that Plaintiff's claim of IIED is untimely for the same reasons that Plaintiff's claim of defamation was untimely.[136]  For the reasons set forth above, any prescription claim is meritless.

Turning to the substance of Plaintiff's IIED claim, Defendants argue Plaintiff cannot prove his claim for IIED because Defendants' alleged conduct was not so outrageous that it constitutes "the most unusual of cases" and "more than a reasonable person could be expected to endure." Thus, Defendants maintain the alleged conduct does not rise to the level of IIED.[137]  Defendants cite several cases wherein they claim far more outrageous conduct than that alleged here was found insufficient to state a viable claim for IIED.[138]  However, the Court fails to see the applicability of the cited cases, which involved verbal harassment, name-calling, racial epithets, or comments regarding one's body parts, but none involved an ostensible accusation of pedophilia.[139]

Considering all evidence submitted in this matter, Plaintiff's IIED claims fails only on the severity of emotional distress element: Plaintiff fails to submit summary judgment evidence demonstrating his severe emotional distress.  No medical records or evidence of medical care has been provided; Plaintiff has not submitted any evidence, or even argued, that he sought mental health treatment or counseling, had nightmares or lost an excessive amount of sleep regarding the events, or any other evidence that Plaintiff suffered from severe emotional distress.[140]

---

[136] Rec. Doc. No. 17-1, p. 16.

[137] Rec. Doc. No. 17-1, pp. 17-18, citing *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1027 (La. 2000); *Barber v. Marine Drilling Mgt., Inc.*, Civ. A. No. 01-1986, 2002 U.S. Dist. Lexis 2821 (E.D. La. Feb. 15, 2002).

[138] Rec. Doc. No. 17-1, pp. 17-18.

[139] *Id.*

[140] With regard to Mrs. Lewis' loss of consortium claim, the parties address deposition testimony that Mr. Lewis could not engage in sexual intercourse due to impotency and had a "change in personality" due to

58141

Plaintiff fails to offer summary judgment evidence that the mental anguish he suffered rises to the level of "unendurable" as required by the Fifth Circuit.[141]  In *Martin v. Winn-Dixie Louisiana, Inc.*,[142] a sexual harassment hostile work environment case wherein the plaintiff also asserted an IIED claim, this Court held that, "[e]ven assuming Defendant's conduct was outrageous and extreme, Plaintiff has testified that she felt horrible, humiliated, and upset, but she has not shown that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.'"[143]  The Court noted that the plaintiff  "produced no evidence of a single doctor's visit or a single prescription for such potentially serious conditions of emotional turmoil" and only a prescription for high blood pressure had been adduced."  The Court held this insufficient based on Fifth Circuit precedent holding that "a woman's mild levels of fear, anxiety, fatigue, high blood pressure, and depression did not constitute severe emotional distress."[144]

As Plaintiff has failed to present summary judgment evidence demonstrating a materially disputed fact regarding this element of his IIED claim, Defendants are entitled to summary judgment on Plaintiff's IIED claim.

---

the mannequin display.  Rec. Doc. No. 17-3, pp. 23, 29-29.  However, no evidence has been provided to the Court of "severe emotional distress" and mental treatment by any medical professional.
[141] *See Smith v. Amedisys, Inc.*, 298 F.3d 434, 449 (5th Cir.2002)(citing *White*, 585 So.2d at 1209).
[142] 132 F.Supp.3d 794 (M.D. La. 2015).
[143] *Id.* at 824 (quoting *Aronzon v. Sw. Airlines*, No. 03–394, 2004 U.S. Dist. LEXIS 249, at *18, 2004 WL 57079, at *6 (E.D. La. Jan. 9, 2004) (quoting *Norred v. Radisson Hotel Corp.*, 665 So.2d 753, 756 (La. App. 1 Cir. 1995), and, *Magee v. Pittman*, 761 So.2d 731, 752 (La. App. 1 Cir. 2000))).
[144] *Id.* (citing *Carroll v. Hoechst Celenese Corp.*, No. 98–41056, 1999 U.S. App. LEXIS 39562, at *23–24, 1999 WL 1330688, at *9 (5th Cir. December 17, 1999)).
58141

3.   Loss of Consortium

Under Louisiana law, a cause of action exists for "loss of consortium, service, and society" for the spouse of an injured victim.[145]   "The compensable elements of a claim for loss of consortium ... include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity."[146]   Mrs. Lewis asserts a claim for loss of consortium, alleging that she suffered the loss of consortium and love, affection, and support due to the injuries and damages her husband sustained.

Defendants move for summary judgment on this claim, arguing Mrs. Lewis cannot show that her purported complaints and difficulties in her sexual and marital life were caused by the mannequins display.  Rather, Defendants cite summary judgment evidence of the following more probable causes of strife in Plaintiffs' marriage and sexual relationship:  (1) Plaintiff engaged in an extramarital affair after he left employment with M7, which Mrs. Lewis discovered in July or August of 2016;[147] (2) Plaintiff proposed "swinging" to Mrs. Lewis;[148] (3) Plaintiff told his marriage counselor that Mrs. Lewis was not someone he wanted to have sex with;[149] (4) Plaintiff complained that he was not

---

[145] *See e.g. Ferrell v. Fireman's Fund Ins. Co.*, 696 So.2d 569, 573 (La. 1997).

[146] *Id.* (citing *Choyce v. Sisters of Incarnate Word*, 642 So.2d 287 (La.App. 2nd Cir. 1994)).

[147] Rec. Doc. No. 17-9, pp. 3-6.

[148] Rec. Doc. No. 17-10, p. 6.  Defendants also argued that Plaintiff proposed an "open marriage," citing to this same testimony; however, Mrs. Lewis did not testify about open marriages.  Mrs. Lewis testified that Plaintiff suggested swinging at one time but neither of them really knew what it was, and that was the extent of that idea.

[149] Rec. Doc. No. 17-10, pp. 7-8. Again, Defendants' characterization of Mrs. Lewis' testimony is not reflected in Mrs. Lewis' actual testimony.  Mrs. Lewis testified that Plaintiff never told her that she was not someone that he wanted to have sex with.  She volunteered that he wanted her to loosen up and be more fun.

58141

satisfied with his marital sex life;[150] (5) Plaintiff "pressured" Mrs. Lewis to engage in anal and oral sex;[151] (6) Plaintiffs were victims of the August 2016 flood and it was "stressful";[152] (7) Plaintiff experienced inconsistent employment and significant financial problems;[153] and (8) Plaintiffs' strained relationship with their son affected their relationship with their grand-daughter, for which they sought counseling.[154]  Defendants argue that this evidence,  along with the lack of supporting medical evidence, establishes that Mrs. Lewis cannot prove that her sexual and marital issues were caused by the mannequin display.[155]

Plaintiffs' oppose Defendants' motion on this claim, arguing that, because a loss of consortium claim is a derivative claim and Plaintiffs have "demonstrated his claims do not fail," Defendants' argument has no merit.[156]  Plaintiffs also maintain that their treating counselors and psychological health professionals who have been identified will testify as to how the sexual display at work affected Plaintiffs, and both Plaintiffs have testified as to the specific effects on their marital and sexual relationship.

The Court notes that, upon reviewing the record evidence in this case, Plaintiff's loss of consortium claim is weak with respect to causation considering several other potential causes for the damages suffered by Mrs. Lewis.  However, as the Court is

---

[150] Rec. Doc. No. 17-5, p. 13.  Actually, Plaintiff testified that he was jealous that his co-worker's wife "gave him a blow-job" but that his wife, Mrs. Lewis, did not believe in performing such acts.
[151] Rec. Doc. No. 17-10, pp. 2-3, 9-10.
[152] Rec. Doc. No. 17-9, pp. 2-3.  Mrs. Lewis testified that this did not contribute to damaging their marital sex life.
[153] Defendants cite to Rec. Doc. No. 17-3, pp. 16-18, and No. 17-4, p. 9; however, the deposition transcripts do not reflect any testimony regarding Plaintiff's "inconsistent employment and significant financial problems".  The testimony reflects that the movie industry was volatile and that Plaintiff did not work other jobs in between movie jobs.  Sometimes, he drew unemployment.
[154] Rec. Doc. No. 17-10, p. 10.
[155] Rec. Doc. No. 17-1, p. 20.
[156] Rec. Doc. No. 23, p. 11.
58141

proceeding to trial on Plaintiff's Title VII claim, the Court declines to grant summary judgment on Mrs. Lewis' loss of consortium claim and will allow evidence to be presented on this claim at the bench trial set for December 9, 2019.  Therefore, Defendants' motion is DENIED as to Mrs. Lewis' loss of consortium claim.

## III.     CONCLUSION

For the reasons set forth above, Defendants' *Motion for Summary Judgment*[157] is granted in part and denied in part.  Plaintiffs' Title VII claim is DISMISSED WITH PREJUDICE against the individual defendants.  M7's motion is DENIED as to Plaintiff's Title VII claim.  Defendants' motion is GRANTED as to Plaintiffs' state law claims of defamation and IIED, and these claims are DISMISSED WITH PREJUDICE.  Defendants' motion is DENIED as to Mrs. Lewis's loss of consortium claim.  The Court will hear the remaining claims at the December 9, 2019 Bench Trial.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>November 26, 2019</u>.


_____
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[157] Rec. Doc. No. 17.
58141